## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------------------x

BRUCE DAWSON and JOHN TAMBURINI
individually and on behalf of all others similarly
situated,

                          Plaintiffs,

      v.

GENERAL MOTORS LLC,

                        Defendant.

------------------------------------------------------------x

No. 3:19-cv-08680

**FIRST AMENDED COMPLAINT – CLASS ACTION**

**<u>JURY TRIAL DEMANDED</u>**

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ................................................................................ 1

II.  JURISDICTION AND VENUE .......................................................................... 4

III.  PARTIES ........................................................................................................... 4

IV.  CLASS ACTION ALLEGATIONS .................................................................. 11

V.  STATUTES OF LIMITATION ......................................................................... 14

VI.  ADDITIONAL FACTUAL ALLEGATIONS ................................................... 15

CAUSES OF ACTION ............................................................................................ 45

COUNT I ................................................................................................................. 45

COUNT II ................................................................................................................ 48

COUNT III .............................................................................................................. 49

COUNT IV ............................................................................................................... 51

COUNT V ................................................................................................................ 53

VII.  REQUEST FOR RELIEF ................................................................................ 54

VIII. DEMAND FOR JURY TRIAL ........................................................................ 55

Plaintiffs Bruce Dawson and John Tamburini ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against General Motors LLC ("Defendant" or "GM"), based where applicable on personal knowledge, information and belief, and the investigation of counsel.

## I.    NATURE OF THE ACTION

1.      This class action concerns diesel vehicles sold in New Jersey with CP4 fuel injection pumps. Specifically, the vehicles at issue refer to GM manufactured vehicles, including, but not limited to the following: the 2011-2016 model year Chevrolet Silverado 2500 and 3500 and the 2011-2016 model year GMC Sierra 2500 and 3500, which are equipped with the 6.6 liter, V-8, turbocharged, Duramax engine (collectively, the "Class Vehicles").

2.      Diesel vehicles are generally known for their reliability and GM marketed and sold the Class Vehicles based on their purported dependability and fuel efficiency.

3.       GM, however, failed to disclose to Plaintiffs and other buyers/lessees that the Bosch CP4 high pressure fuel injection pumps installed in the Class Vehicles are defective when used in the United States.

4.      Specifically, such pumps, which require a certain amount of lubricity, are incompatible with U.S. diesel fuel, which does not have the required lubricity. This causes the pumps to fail catastrophically, sending metal shards throughout the entire fuel injection system and engine, which necessitates repairs costing anywhere from $7,000 to $20,000.  Moreover, the "repair" typically includes replacing the defective component – the Bosch CP4 pump – with the same defective component – another identical Bosch CP4 pump.

5.      This defect also poses a safety risk to the driver and passengers of the Class Vehicles because when the pump fails it often causes the vehicle to lose power and stall at high speeds, which exposes the driver and passengers to increased risk of accident, injury, or death.

6.      GM knew that the Class Vehicles were defective before and at the time they were sold.  However, instead of alerting Plaintiffs and the members of the Class, it posted service bulletins to dealers – not consumers – and ultimately replaced the Bosch CP4 fuel injection pump with the HP4 fuel injection pump - supplied by Denso - beginning in the 2017 models of the vehicles at issue.  GM has continued to conceal the problems with the Bosch CP4 pump even after it stopped using the CP4 injection pump.  Defendant also failed to disclose that the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns alleged herein.

7.      Not only did GM know that the Class Vehicles were defective at the point of sale, but GM knew that the fuel incompatibility defect was certain to cause the CP4 fuel injection pump to fail within or shortly after the warranty period expired. GM also knew that a consumer could not reasonably discover the defect because the fuel incompatibility would only be apparent to a consumer in one of two ways: (a) if a consumer knew about the different wear scar diameter characteristics of American versus European diesel fuel and about the CP4 pump's corresponding specifications, or (b) when the consumer experienced the effect of the defect for the first time, *e.g.*, vehicle stalling or complete failure.

8.      Many owners and lessees of the Class Vehicles have communicated with Defendant's agents to request that they remedy and/or address the resultant damage at no expense, but Defendant has failed and/or refused to do so.  Moreover, GM often blames the consumer for the CP4 fuel pump failures by claiming that the problem is due to fuel

2

contamination even though GM is aware that the CP4 fuel pumps are incompatible with all U.S. diesel fuel. GM's knowledge of the defect and its certain failure could not be discovered by Plaintiffs, Class Members, or the public because relevant industry information was not readily available to them and because GM was deliberately omitting or concealing the existence of the defect from Plaintiffs, the Class Members, and the public.

9.      Defendant has also refused to take any action to correct the defect and/or resultant damage when it manifests in the Class Vehicles outside of the warranty period.  Since the problem typically manifests within and/or shortly outside of the warranty period for the Class Vehicles – and given Defendant's knowledge of the problem – any attempt by Defendant to limit the warranty with respect to the defect is unconscionable.

10.      Plaintiffs are consumers who were hoodwinked into purchasing these vehicles. As a result of Defendant's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

11.      Plaintiffs would not have purchased these vehicles and/or would have paid less for such vehicles had GM revealed the defect.  Plaintiffs have also paid thousands of dollars to repair the vehicles when the pumps failed.

12.      Plaintiffs bring this suit on behalf of a proposed class of similarly situated consumers.  They assert that GM has violated established New Jersey state consumer protection laws, breached express and implied warranties, and unjustly enriched itself to the detriment of Plaintiffs and the Class.  Plaintiffs seek damages and equitable relief on behalf of themselves and the proposed Class.

## II.   JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the proposed class is of diverse citizenship from one defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

14.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

15.    This Court has personal jurisdiction over Defendant because it conducts business in New Jersey, and has sufficient minimum contacts with New Jersey.

16.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendant has caused harm to class members residing in this District.

## III.   PARTIES

### Plaintiff Dawson

17.    Plaintiff Bruce Dawson ("Dawson") is a citizen of the State of New Jersey and is domiciled in Ship Bottom, New Jersey. In October 2010, Dawson purchased a new 2011 GMC Sierra 3500 pickup truck (VIN: 1GT42XE83GF188510) from an authorized GM dealership located in Manahawkin, New Jersey for approximately $51,521. Dawson used this as both his personal vehicle and for his business, Dawson's Boat Hauling. In the fall of 2013, the Bosch CP4 fuel pump in Dawson's vehicle experienced a catastrophic failure while hauling a boat on a trailer in Charlottesville, Virginia. At the time, Dawson's truck had approximately 165,000 miles. As a result of this breakdown, Dawson was forced to pay a third party $800 to complete this boat transport job. Defendants did not reimburse Dawson for such expenses. Moreover,

Dawson lost the use of this truck for about 40 days, when damage due to the defective Bosch CP4 pump was being repaired.

18.    At the time Dawson purchased his 2011 GMC Sierra 3500, and in purchasing the vehicle, Dawson relied on representations from GM and its authorized dealership that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Dawson relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, caused Dawson to purchase the vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Dawson, at the time of purchase, the 2011 GMC Sierra 3500 contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Dawson relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Dawson or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Dawson and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

5

19.     In April 2015, Dawson purchased a 2016 GMC Sierra 3500 pickup truck, VIN: 1GT42XE83GF188510, from Asplundh GMC (now Barlow Buick GMC), an authorized GM dealership located in Manahawkin, New Jersey for approximately $60,071.  Dawson used this as both his personal vehicle and for his business, Dawson's Boat Hauling. In or around October 2016, with approximately 44,658 miles on his Class Vehicle's odometer, Dawson experienced a failure of his CP4 fuel injection pump. As Dawson was driving his vehicle while towing his client's boat on an attached trailer, the "check engine" appeared on his dashboard, and his vehicle suddenly lost power and stalled. He took the vehicle to an authorized GM dealership, Jim Browne Chevrolet Buick GMC in Dade City, Florida. After consulting a service bulletin, "Document ID 4474673," the service technician "found injection pump came a part and spread metal throughout fuel system[.]" The technician replaced the fuel pump, along with several other parts. Approximately six weeks later, in November 2016, with approximately 45,960 miles on his vehicle, Dawson experienced further problems associated with the failure and replacement of the CP4 fuel pump. He took his truck to Barlow Buick GMC in Manahawkin, New Jersey, where they performed additional repairs including replacing the fuel injector and filter. Approximately a week and a half later, on or around November 28, 2016, with 48,656 miles on his odometer, Dawson noticed that fuel was leaking from the bottom of his vehicle in such volume that it destroyed the finish on the left running board of the truck. He returned to Barlow Buick GMC, where the service technician "found fuel coming from return lines at INJ#1, INJ#2, and #4" and found that the "return lines [were] not properly seated [*sic*]." The technician reinstalled the return lines and performed other checks, and returned the vehicle to Dawson.

20.     Dawson lost the use of his truck and the trailer it was towing for more than 40

days. Dawson was required to pay a third party to tow his trailer with his client's boat on it from

Dade City, Florida back to New Jersey – an expense that was never reimbursed by GM.

Although GM provided Dawson with a rental car to get home from Florida, GM failed to

provide a replacement truck during the time when his vehicle was out of service. As a result,

Dawson was forced to turn down boat hauling jobs that he would have accepted normally if he

had the use of this vehicle. Dawson continued using the 2016 GMC Sierra until 2018, when he

sold it with 180,000 miles.

21.     At the time Dawson purchased his 2016 GMC Sierra 3500, and in purchasing the

vehicle, Dawson relied on representations from GM and its authorized dealership that the

vehicle was compatible with American diesel fuel, was durable, and was reliable. Dawson relied

on these representations in purchasing the vehicle and, absent these representations, would not

have purchased the vehicle and/or would have paid less for it. These knowingly false

representations, in combination with the advertised fuel efficiency and performance, the

representation that the vehicle would retain all of its promised fuel economy and performance

throughout its useful life, and the vehicle's reputation for maintaining a high resale value,

caused Dawson to purchase the vehicle, which is unfit for its ordinary use and purpose.

Unbeknownst to Dawson, at the time of purchase, the 2016 GMC Sierra 3500 contained a

defective CP4 fuel injection system that was not suitable for American vehicles and which

deceived American consumers. Consequently, the vehicle could not deliver the advertised

combination of durability, power, reliability, and fuel efficiency of diesel that Dawson relied

upon. Neither GM nor any of its agents, dealers, or other representatives informed Dawson or

Class members of the existence of the unlawfully and/or unexpectedly defective nature of the

GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Dawson and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

22. Dawson's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Accordingly, Dawson brings claims individually and as a representative of the Class.

**Plaintiff Tamburini**

23. Plaintiff John Tamburini ("Tamburini") is a citizen of the State of New Jersey and is domiciled in Hillsborough, New Jersey. On August 25, 2015, Tamburini purchased and took delivery of a new 2015 GMC Sierra 2500 pickup truck (Vin: 1GT12YE85FF545404) from Barlow Buick GMC, an authorized GM dealership located in Manahawkin, New Jersey, and paid approximately $55,428.00. Tamburini, who is a certified boat engine mechanic, used this vehicle as both his personal vehicle and for his business, On The Ramp Marine Trans LLC.

24. On December 27, 2017, Tamburini's vehicle was driving on the New York State Thruway when the gas throttle pedal became hesitant and then nonresponsive and the vehicle lost its ability to accelerate. The engine warning light "Fuel Filter Blockage" flashed on, even though a new fuel filter had recently been installed. The "Check Engine" and "Service Engine Soon" warnings also flashed on. He pumped the breaks and coasted to the side of the road and the vehicle ceased operating entirely. The vehicle was then towed to Barlow Buick GMC at a cost of

8

approximately $275. The Barlow technician diagnosed the vehicle as "crank no start" and "low fuel pressure while cranking," and told Tamburini the vehicle's current Bosch CP4 fuel pump had failed and that the vehicle would require a new one. The vehicle had 128,543 miles on it at the time.

25.     Tamburini then paid to have the vehicle towed to his residence. From January to March, 2018, he purchased original equipment manufacturer (OEM) and non-OEM parts from Barlow Diesel Power Service in Williamsport, PA and Xtreme Diesel Performance in North Wall Township, NJ, for a total cost of over $10,000, that enabled him to replace the defective Bosch CP4 fuel pump in his vehicle and fix the damage the defective fuel pump caused to his vehicle's engine. He also rented a fuel tank polisher to clean out the fuel tank, which contained metal shavings that resulted from the failure of the Bosch CP4 fuel pump. Tamburini lost the use of this truck, with corresponding loss of business revenue, for about 60 days, when damage due to the defective Bosch CP4 pump was being repaired.

26.     At the time Tamburini purchased his 2015 GMC Sierra 2500 pickup truck, and in purchasing the vehicle, Tamburini relied on representations from GM and its authorized dealership that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Tamburini relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, caused Tamburini to purchase the vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Tamburini, at the time of purchase, the 2015 GMC Sierra 2500 pickup

9

truck contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, longevity and fuel efficiency of diesel that Tamburini relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Tamburini or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system— which is common to all Class Vehicles—prior to purchasing. Accordingly, Tamburini and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

27.     In December of 2018, Tamburini traded in the vehicle, which had 158,725 miles on it at the time, for a new 2018 Dodge Ram 2500 pickup truck.

28.     Tamburini's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Accordingly, Tamburini brings claims individually and as a representative of the Class.

29.     Defendant General Motors LLC ("GM") is a Delaware limited liability company doing business throughout the United States and in various other countries and which does substantial business in New Jersey. GM is based in Detroit, Michigan.  The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance CTR in Detroit, Michigan.  General Motor Holdings LLC's only member is General Motors Company, a

Delaware corporation with its principal place of business in the State of Michigan. General Motors Company wholly owns General Motors Holdings LLC.

30.     At all relevant times, GM, through its various entities, manufactures, distributes, designs, sells, leases and warranties the Class Vehicles in this District and other locations in the United States.  Its core automobile brands include GMC and Chevrolet. GM and/or its affiliates and agents designed, manufactured and installed the engines systems in the Class Vehicles, which included the CP4 pump.  GM and/or its affiliates and agents also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

## IV.    <u>CLASS ACTION ALLEGATIONS</u>

31.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons or entities who purchased or leased a Class Vehicle in the State of New Jersey (the "Class").

32.     Excluded from the Class are individuals who have personal injury claims as a result of the facts herein.  Also excluded from the Class are GM and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.  Plaintiffs reserve the right to revise the definition of the Class based upon information learned through discovery.

33.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

11

34.     This action has been brought and may be properly maintained on behalf of the

Class proposed herein under Federal Rule of Civil Procedure 23.

35.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  The members of the Class are so

numerous and geographically dispersed that individual joinder is impracticable.  While Plaintiffs

are informed and believe that there are not less than thousands of members in the Class, the

precise number of Class members is unknown to Plaintiffs, but may be ascertained from GM's

records.  Members of the Class may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. mail, electronic mail,

Internet postings, and/or published notice.

36.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):**

There are numerous questions of law and fact common to Plaintiffs and the Class that

predominate over any questions affecting individual members of the Class including, without

limitation:

(a)     Whether GM engaged in the conduct alleged herein;

(b)     Whether the CP4 injection pump is incompatible with diesel fuel sold in the United States;

(c)     Whether GM knew about the defect and, if so, how long GM has known;

(d)     Whether GM's conduct violates New Jersey consumer protection statutes, warranty laws, and other laws as asserted herein;

(e)     Whether Plaintiffs and the other members of the Class overpaid for their Class Vehicles;

(f)     Whether Plaintiffs and the other members of the Class are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

(g)     Whether Plaintiffs and the other members of the Class are entitled to damages and other monetary relief and, if so, in what amount.

12

37.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through GM's wrongful conduct as described above.

38.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

39.     **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):**  GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

40.     **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Absent a class action, most members of the Class would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Even if members of the Class could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## V.    **STATUTES OF LIMITATION**

41.    For the following reasons, any otherwise-applicable statutes of limitation have been tolled or are otherwise inapplicable with respect to all claims alleged in this Complaint.

### A.    **Discovery Rule Tolling**

42.    Within the time period of any applicable statutes of limitation, Plaintiffs and other members of the Class, through the exercise of reasonable diligence, could not have discovered that GM was concealing the defects in the Class Vehicles.

43.    Plaintiffs and the members of the Class could not reasonably discover, and did not know of facts that would have caused a reasonable person to suspect, that GM intentionally failed to report information within its knowledge to federal and state authorities, its dealerships, or consumers.

44.    Likewise, a reasonable and diligent investigation could not have disclosed that GM had information in its sole possession about the existence of its deception and that it concealed that information, which was discovered by Plaintiffs immediately before this action was filed.  Plaintiffs and other members of the Class could not have previously learned that GM valued profits over compliance with applicable federal and state consumer laws.

### B.    **Fraudulent Concealment Tolling**

45.    Throughout the relevant time period, all applicable statutes of limitation have also been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

46.    Instead of disclosing the defects of which it was aware, GM falsely represented that its vehicles were safe and durable, and that it was a reputable manufacturer whose representations could be trusted.

### C.    **Estoppel**

14

47.     GM was under a continuous duty to disclose to Plaintiffs and the other members of the Class the true character and quality of the Class Vehicles, including the CP4 pump failure and effects thereof.

48.     GM instead knowingly, affirmatively and actively concealed the foregoing facts.

49.     Based on the foregoing, GM is estopped from relying on any statutes of limitations or laches defense in this action.

## VI.     ADDITIONAL FACTUAL ALLEGATIONS

50.     GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In 2018, GM sold 2,954,037 vehicles in the United States alone, primarily through its network of authorized U.S. dealerships, and "had the number one market share in . . . North America[.]"[1]

51.     GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[2]  Its net automotive sales through those dealerships, for its North American region in 2018, totaled $113,792,000.[3] GM sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiffs and Class Members, they purchase additional vehicle inventory from GM to replace the vehicles sold, increasing GM's

---

[1]     *See* General Motors Company 2018 Annual Report (Form 10-K), at 2 (Feb. 6, 2019), available at: https://www.sec.gov/Archives/edgar/data/1467858/000146785819000033/gm201810k.htm (last accessed May 7, 2019).

[2]     *Id.* at 3.

[3]     *Id.* at 25.

revenues. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles accrues to the benefit of GM by increasing its revenues.

52.     GM  manufactured and sold cars that it knew contained CP4 fuel pumps which were incompatible with American diesel fuel.  GM sold cars with these defective pumps, intentionally and knowingly hiding the truth about such defects, in part by concealing information exclusively within the control of GM and other industry players.

### A.     Plaintiffs Paid a Premium for the Diesel Vehicles, Which Were Falsely Touted for Their Durability and Compatibility with American Diesel Fuel by Defendant

53.     Defendant charges a premium for its diesel pickup trucks.  For example, a 2018 GM Sierra 2500 HD, with a gasoline engine has a net price of $43,195.  The same model, with the diesel engine, however, has an MSRP of $52,590.[4]

54.     Consumers are willing to pay such a premium for diesel pickup trucks in return for the durability and reliability of such vehicles, which are known to last hundreds of thousands of miles longer than gasoline pickup trucks.

55.     In fact, GM has always emphasized the quality, reliability and efficiency of the Class Vehicles and knows that consumers, including Plaintiffs and the Class, rely upon such factors when purchasing or leasing Class Vehicles. For example, the "2011 GMC Sierra heavy duty" brochure assures consumers that "when our engineers created the new 2011 Sierra Heavy Duty Series, they left no bolt unturned. By rejecting compromise and crafting every detail, GMC delivered the strongest, most powerful and most capable lineup of Sierra HD Pickups, ever. . . . GMC. We are professional grade."  The brochure extols its virtues and assures consumers specifically that "[t]he available new Duramax diesel 6.6L V-8 Turbo … [is] engineered to

---

[4] https://www.gmc.com/previous-year/sierra-2500hd-pickup-truck/build-and-price/config

achieve a goal that most assumed to be impossible: improving power and mileage, together. Advanced diesel direct-injection technology and an adaptive transmission controller help Duramax to run at peak efficiency, and provide you with a highway mileage range of up to 680 highway miles."  The brochure also states that "Sierra offers the best coverage in America . . . with GM's 5-Year/100,000-Miles Transferable Powertrain Limited Warranty."[5]

56.     Astonishingly, GM's press releases at least as early as March 2010 contain numerous representations about the Duramax engine's fuel capabilities and resulting enhancements. In announcing its "two new Duramax 6.6L turbo diesel engines, which are offered on the new [2011] GMC Sierra Denali HD, 2500HD and 3500HD[,]" GM stated,

> The original Duramax turbo diesel earned its reputation for durability and led the industry with first-in-class common rail fuel injection and aluminum heads with a six-bolt-per-cylinder design. Those attributes formed the foundation for the 2011 engine, with digital modeling and simulation tools used to raise the Duramax's power and durability benchmarks. It is expected to produce significantly more torque and horsepower than the previous engine, while delivering greater strength and durability.
>
> .***
> . . . . A new 30,000-psi (2,000 bar) piezo-actuated fuel injection system – capable of operating on ASTM grade B20 biodiesel – ensures more precise fuel delivery, improving emission performance and playing a crucial role in reducing high-speed noise, vibration and harshness.
>
> ***
>
> GMC backs the Duramax with a five-year/100,000-mile powertrain warranty. **The engine has been developed to operate for at least 200,000 miles (322,000 km) on a rough-duty cycle without the need for a major overhaul.**
>
> **"We recognize that a great number of our customers will use the product to its limits.  That's why we design our durability schedules to test for these heavy-towing customers.  We also recognize that having any issues when towing large cargo long distances is much more than an inconvenience.**

---

[5] http://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20SierraHD_2011.pdf (last visited on March 14, 2019.)

**That's why reliability and durability are a top focus for us**," Arvan [GM's Duramax chief engineer] said.

\*\*\*

The 2011 Duramax 6.6L will also include GM's second-generation diesel particulate filter system. Unlike most of the competition, the **Duramax regenerates its diesel particulate filter using a downstream injection of diesel fuel directly into the exhaust stream and can travel up to 700 miles (1,125 km) between regenerations – a 300-mile (482 km) increase over the previous Duramax engine**. **The use of downstream injection also helps improve engine life** by eliminating concerns surrounding the possibility of diesel fuel contaminating engine oil, which can happen when fuel used for regeneration is introduced directly into the cylinder.[6]

57.     In another March 10, 2010 press release about the new Duramax diesel engines in 2011 GMC Sierras, GM similarly touted the turbo diesel engine's combination of fuel efficiency, durability, and power: "We designed the engine to make that power with less fuel and fewer emissions, while also increasing its durability. Customers will immediately feel the difference in power and, over years of service, appreciate all the other attributes that make it a dependable engine for any task." The same press release, stated that "[a]mong the 6.6L Duramax turbo diesel's new and enhanced features are: . . A new 30,000-psi (2,000 bar) piezo-actuated fuel injection system – capable of operating on ASTM grade B20 biodiesel – ensures more precise fuel delivery, improving emission performance[.]"[7]

58.     Another March 10, 2010 press release highlighted the same characteristics in announcing the new turbo diesel Duramax engine in the 2011 Chevrolet Silverados, stating, "Silverado HD trucks are offered with a new version of the 6.6L Duramax turbo diesel engine

---

[6] "GMC's 2011 Heavy-Duty Trucks Build On Proven Strong Heritage With New Duramax 6.6L Turbo Diesel Engines." March 10, 2010, available at https://media.gm.com/media/us/en/gmc/news.detail.html/content/Pages/news/us/en/2010/Mar/0310_gmc_sierra_hd/0310_duramax.html (last accessed August 19, 2019) (emphases added).
[7] "New 2011 GMC Sierra Heavy-Duty Trucks Deliver Best-In-Class Diesel Torque And Horsepower." March 10, 2010, available at https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2010/Mar/0310_gmc_sierra_hd/0310_power_ratings.html (last accessed August 19, 2019) (emphases added).

that is more powerful, more efficient, compatible with B20 biodiesel and delivers up to 63-percent lower NOx emissions. It is also enhanced for greater durability."[8]

59.     The sum of the press releases, sales brochures, and advertising materials, only a sample of which is included above, repeatedly represented the Class Vehicles as not only being compatible with American diesel fuel, but capable of operating "for at least 200,000 miles on a rough-duty cycle without the need for a major overhaul," and more durable, more reliable, and more fuel efficient than the previous version of the Duramax containing the CP3 pump. Unfortunately for consumers who bought GM's vehicles with CP4 fuel injection pumps, such pumps were defective, causing Plaintiffs and Class members to not only pay more than such trucks were worth, but causing consumers to often spend thousands of dollars in repair costs and/or repair kits, which were ineffective remedies at best.

### B.      The Defective CP4 Fuel Injection Pumps

60.     GM introduced its Duramax engine in its 2001 model diesel vehicles.  This engine, the 6.6L LB7 Duramax, contained a Bosch CP3 fuel injection pump.

61.     After redesigns in 2004, 2006, and 2007, the Duramax was remodeled again for its 2011 model year.  This engine, the 6.6 LML Duramax, replaced the Bosch CP3 fuel injection pump with a Bosch CP4 fuel injection pump.

62.     The fuel injection pump is an essential part of the diesel engine.  Diesel engines, like gasoline engines, convert fuel into energy through a series of small explosions or combustions.  In general, a diesel fuel system injects precise amounts of pressurized diesel fuel at specific times.  When the fuel mixes with hot compressed air, combustion occurs.  Immense

---

[8] "Chevrolet's New 2011 Silverado HD Chassis Cab And Box-Delete Models Deliver Greater Capability And Expanded Range Of Uses." March 10, 2010, available at https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2010/Mar/0310_silverado_cab.html (last accessed August 19, 2019).

amounts of pressure are needed to compress diesel fuel.  The diesel high-pressure injection pump is responsible for compressing the diesel fuel in preparation for injection into the combustion chamber.

63.     The CP4 fuel injection pump – the successor to the CP3 fuel injector pump, which was known for its reliability – creates higher pressure with less volume, thus providing a more efficient pump but with less lubrication.

64.     Lubricity – the ability of a fluid to minimize the degree of friction between surfaces in relative motion under load conditions – is critical because if lubricity is not at a satisfactory level, then internal engine components including the fuel pump are prone to excessive wear causing them to fail.

65.     The CP4 relies on diesel fuel to maintain lubrication.  While the CP4 has been used in Europe for many years without trouble, the same cannot be said for the CP4 in vehicles in the United States because American diesel fuel has less lubricity than European diesel fuel due to requirements imposed by the Environmental Protection Agency ("EPA").

66.     The combination of a low volume of fuel with the low lubricity of American diesel fuel – problems of which GM was well aware, as detailed below – causes the CP4 pump to fail, sending metal shavings throughout the fuel system and often requiring replacement of all of the fuel system components, including the CP4 pump, fuel injectors, injection lines, and fuel rails. Additionally, such catastrophic failure often causes the vehicle to stall or die altogether.

67.     An article published in December 2017 by Diesel Tech magazine, entitled "Common Problems: The CP4 Time Bomb," aptly explained both the problem and some costly remedies as follows:

To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump on 2011-present LML Duramax engines. Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. **Even if you have a 100 percent stock pickup, there's a [really] good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system.**

So what's going on here? Well, as with most things, the blame lies in the fact that the CP4 replaced the old reliable CP3 as a cost-saving measure. See, the newer model trucks have more efficient piezoelectric injectors, which means they require less fuel to run properly. Sounds good, right? The problem is that with less fuel volume comes less lubrication of the components in the pump. Adding to the trouble is the fact that the ultra low-sulfur diesel we have in the US has less lubricity than elsewhere in the world.

Another contributing factor is that stock Duramax engines don't have lift pumps. Lift pumps help supply fuel directly to the injection pump, which then sends it on to the engine. This decreases the amount of work the injection pump has to do, which obviously leads to longer pump life. All that is a long way of saying that the injection pumps on Chevys have to do all the work with worse lubrication. Even a CP3 pump will have a hard time providing the necessary fueling without a little extra help. Without a lift pump, the fuel is under constant suction, which causes undue wear and tear on the pump and the injectors, as well as cavitation. Quick side note: besides being a word that my word processor doesn't recognize, cavitation is defined as the formation of empty space within a liquid because of a propeller. In layman's terms, it means air bubbles that show up because of the speed of the fan. It shows up more commonly with boats, where the propeller is the means of propulsion, but the same concept applies to any kind of fan-driven pump.

**Add all these things up and it's literally just a matter of time until your CP4 pump fails.** As I said before, it can be catastrophic when this happens, because not only will it destroy the injectors, but **it will leave metal shavings in your fuel lines** (which is impossible to fix without replacing the entire system) and can even in rare cases crack the gear and throw it through the engine's front timing cover. . . .

The most popular way to address this issue is to simply replace the CP4 with a CP3. Many companies, such as Fleece, BD Diesel, and Dynomite Diesel offer replacement kits that come with everything you need to change out the offending CP4 with a stronger, more reliable CP3. Some companies even offer the solution of a dual fueler kit, which is simply a CP3 that sits alongside the CP4 to help out with pumping duties. This is more popular with Power Strokes, though, so it may not work as well with a Duramax.

21

Price is obviously an issue for all this, and the cost is going to fluctuate based on how serious you get. As stated, simply adding fuel additives is the cheapest option, with prices ranging from around four dollars for an eight-ounce bottle up to 50 bucks for a gallon. Once you start adding components to the engine, prices go up considerably. CP3 conversion kits will run you anywhere from $600-$3000, depending on whether the kit actually includes the pump. Dual pump kits range between $2000-$3000, depending on whether you want a stock pump or a modified one. Lift kits are comparatively cheap, coming in around $600-$800.[9]

68.     Defendant offered Bumper-to-Bumper warranty coverage for Class Vehicles for 3 year/36,000 miles and a Powertrain warranty for engine parts for 5 year/100,000 miles for HD pickups equipped with a 6.6L Duramax engine.  These warranties cover the parts at issue.

69.     GM's warranties purport to "cover repairs to correct any vehicle defects" at no charge.  Buyers, lessees, and other owners of the Class Vehicles were without access to the information concealed by GM as described herein, and therefore reasonably relied on Defendant's representations and warranties regarding the quality, durability, and other material characteristics of their vehicles. Had these buyers and lessees known of the defect and the potential danger, they would have taken steps to avoid that danger and/or would have paid less for their vehicles than the amounts they actually paid, or would not have purchased their vehicles.

70.     Defendant has declined to extend warranty coverage and free repairs to those owners and lessees of the Class Vehicles who have, and have not yet, experienced failure of the CP4 pump.

71.     Car engines and component parts are designed to function for periods (and mileages) substantially in excess of those specified in GM's warranties, and given past experience, consumers legitimately expect to enjoy the use of an automobile without worry that the engine

---

[9] Common Problems: The CP4 Time Bomb available at
https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time (last visited on March 14, 2019) (emphases added).

will catastrophically fail for significantly longer than the limited times and mileages identified in Defendant's warranties.

**B.  Defendant Had Knowledge of and Concealed the Existence of Defective CP4 Fuel Injection Pumps in the Class Vehicles**

72.   Lower sulfur levels in diesel fuel is desirable because the sulfur in diesel exhaust is a major cause of smog and acid rain. However, sulfur also provides some of the lubricity needed for the CP4 fuel pump to operate. The refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity.

73.   During the desulfurization process via hydrotreating, hydrogen gas is introduced to the crude oil under extreme temperatures and pressures.  The hydrogen combines with the sulfur to form hydrogen sulfides that are then removed and converted into elemental sulfur for resale.  During desulfurization, critical compounds innate to the fuel and responsible for imparting significant lubricity quality, are destroyed under the intense operating conditions.  The resulting yield is the low sulfur diesel fuel, which is low in lubricity.

74.   Low sulfur diesel fuel first appeared in American markets in the 1990's, with fewer than 500 ppm of sulfur.  It is estimated that 65 million fuel injection pumps failed as a result.[10]  It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation.[11] Thus, the critical importance of lubricity for diesel injection pumps and the high failure rate of fuel injection pumps as a result of low sulfur American diesel fuel was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

---

[10] "Getting a grip on fuel lubricity." May 20, 2010, available at https://www.rivieramm.com/news-content-hub/getting-a-grip-on-fuel-lubricity-45685 (last accessed August 24, 2019).
[11] *Id*.

23

75.     As stated above, although the Bosch CP4 fuel pump was used in European vehicles with great success, EPA restrictions imposing low sulfur levels for diesel fuel sold in the United States made the CP4 pump ultimately incompatible with American diesel.

76.     The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. In 2007, the EPA began requiring that diesel fuel sold in the U.S. to have less than 15 ppm of sulfur, also referred to as ultra-low sulfur diesel ("ULSD"). in order to reduce harmful emissions.  After 2010, the EPA's standards required that all on road diesel fuel supplied to the market be ULSD and all on road diesel vehicles must use ULSD.

77.     In the mid-2000s, the EPA required that diesel fuel meet a minimum lubricity level of a maximum wear scar diameter of 520 microns based on the standards propounded by the American Society for Testing and Materials ("ASTM") D-975.  However, the Bosch CP4 pump specifications allow for a maximum 460 wear scar.  The CP4 pump was clearly out of specification and incompatible with American diesel fuel, which GM knew or should have known when it first introduced the Class Vehicles in the marketplace.

78.     The incompatibility of ULSD on high-pressure fuel pump injection systems such as the CP4 are known within the automotive industry and the diesel fuel industry.  For example, the Truck & Engine Manufacturers' Association ("EMA"), of which GM is a member, put out a Position Statement, on April 22, 2002, titled: "EMA Consensus Position Pump Grade Specification," which stated:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

24

79.     On August 8, 2005, the EMA put out a position paper titled: "North American Ultra Low Sulfur Diesel Fuel Properties," which stated:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that USLD fuels have a maximum wear scar of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

Thus, GM knew the Bosch CP4 pump with a maximum 460 wear scar was incompatible with American diesel fuel and would fail as a result.

80.     A 2007 publication by Chevron Corporation titled "Diesel Fuels Technical Review" repeated the ASTM D975 requirement in no uncertain terms under the Questions and Answers section:

> Do some diesel fuels lack lubricity?
>
> Yes. Lubricity is a measure of the fuel's ability to prevent excessive wear when sliding and rotating parts in fuel pumps and injectors come in contact. The processing required to reduce sulfur to 15 ppm may remove naturally occurring lubricity agents in diesel fuel. To manage this change, ASTM International D 975 requires a wear scar no larger than 520 microns using the ASTM D 6079 High Frequency Reciprocating Rig Test Method. This specification provides sufficient fuel lubricity to protect equipment.[12]

81.     However, by 2007, on-road diesel fuel in the U.S. for highway vehicles was uniformly ULSD, which has an allowable sulfur content much lower (15 ppm) than the previous U.S. on-highway standard for low sulfur diesel (550 ppm).[13]

---

[12] "Diesel Fuels Technical Review" at 97, available at https://www.chevron.com/-/media/chevron/operations/documents/diesel-fuel-tech-review.pdf (last accessed August 22, 2019).

[13] See New Ultra Low Sulfur Diesel fuel and new engines and vehicles with advanced emissions control systems offer significant air quality improvement, Clean Diesel Fuel Alliance, Feb. 25, 2017, available at https://web.archive.org/web/20170225141751/http://www.ct.gov/deep/lib/deep/air/ultra_low_sulfur_diesel/ulsdfs.pdf (last accessed Nov. 30, 2018); see also J. Thijssen, LLC, The Impact of Future Diesel Fuel Specifications and Engine Emissions Standards on SOFC, U.S. DEPT. OF ENERGY, NAT'L ENERGY TECHNOLOGY

82.    Thus, GM was well aware that the CP4 pump was inappropriate for diesel vehicles in the U.S. The CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar, which GM knew.  Therefore, by definition the 520 wear scar specification of American diesel is inadequate to lubricate the Pump.

83.    Moreover, in September 2009, the Joint Diesel Fuel Injection Equipment Manufacturers ("Joint FIE Manufacturers") released a "Common Position Statement regarding Fuel Requirements for Diesel Fuel Injection Systems," in which the Joint FIE Manufacturers expressed the following key points to their U.S. automotive industry customers, which included GM:

> "The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets. Rising injection pressures and multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances . . . . Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to  ensure performance of equipment in the field.

> "Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . . It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.

> "Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . ***However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to***

LABORATORY, Jun. 29, 2004, at I, available at https://www.netl.doe.gov/File%20Library/research/coal/energy%20systems/fuel%20cells/DOEDiesel-Final-040629.pdf (last accessed July 25, 2019).

*the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.*"[14]

84.     In reality, U.S. diesel frequently contains even less sulfur than 15 ppm, a truth that is widely known within the U.S. automotive industry. For example, according to a 2014 Infineum Worldwide Winter Diesel Fuel Quality Survey in which 341 diesel fuel samples were tested from around the world, **all** diesel fuel samples that the organization collected and tested from the U.S. and Canada contained 10 ppm S or less.[15]

85.     A prudent manufacturer would design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold.

86.     Yet GM solicited Bosch to provide the CP4 Pump for GM's Duramax engines in the 2010 and 2011 model years. It was no secret to GM that Bosch CP4 Pump was inappropriate for diesel vehicles in the U.S. The Bosch CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. By definition, the 520 wear scar specification of American diesel fuel is inadequate to lubricate the Bosch CP4 Pump.

87.     In order to reduce costs and increase fuel efficiency, GM sold vehicles with a fuel injection pump that was clearly out of specification in that it had inadequate lubrication for the U.S. market.

88.     Moreover, the adverse effects of ULSD on high-pressure fuel pump injection systems – namely, catastrophic failure – have been widely reported within the automotive industry and diesel

---

[14] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009,* Sept. 2009, available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last visited August 19, 2019) (emphasis added).

[15] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014*, INFINEUM INT'L LTD., available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf (last accessed Dec. 3, 2018), at 6-7.

fuel industry prior to GM's introduction of the Class Vehicles.  For example, the 2007 Chevron

publication outlined the consequences of insufficient fuel lubricity on a fuel pump, stating:

> There is no doubt that lubricity is an important property of diesel fuel performance. **A single tankful of fuel with extremely low lubricity can cause fuel injection system components, such as a fuel pump, to catastrophically fail**. Setting a lubricity requirement to prevent catastrophic failure is relatively easy; setting a requirement to avoid long-term fuel system wear is much harder.[16]

89.    The same Chevron publication also warned about the consequences of metal or other

contamination that frequently occurs when the CP4 pump is inadequately lubricated:

> Inadequate lubricity is not the only cause of wear in diesel engine fuel systems. Diesel fuel can cause abrasive wear of the fuel system and the piston rings if it is contaminated with abrasive inorganic particles. Fuel injectors and fuel injection pumps are particularly susceptible to wear because the high liquid pressures they generate require extremely close tolerances between parts moving relative to one another.[17]

90.    And in a July 2014 study on the use of fuel injection equipment with global diesel

fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the

following:

> "The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher . . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. *However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market*. Consideration of filtration performance under less conditions is necessary to develop an acceptable level of protection."

---

[16] *Id.* at 57 (emphasis added).
[17] *Id.*

Steve Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration,* PARKER RACOR & AVL, Jan. 7, 2015, available at https://www.parker.com/literature    /Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (last accessed August 24, 2019), at i; *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29 ("To avoid costly engine and fuel system components damages, advanced multi-stage filtration is recommended"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components . . . . This issue has become a significant concern in the industry").

91.     The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to GM's usage of it in the Class Vehicles. CP4 failures began running rampant in American Audi and Volkswagen vehicles at least as early as 2008,[18] before GM ever implemented the cheaper, less robust pump in its 2011 and later model year diesel automobiles.  These failures echo the very failures that continue to occur in the Class Vehicles to this day.

92.     From late 2011 through early 2012, documentation regarding these widespread CP4 failures was provided to the National Highway Traffic Safety Administration ("NHTSA")

_____

[18] *See, e.g.,* Jul. 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (Jul. 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [REDACTED] (higher by a factor of approx.30 than the average of all markets) . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discussed warranty claims with the implementation of the CP4 in vehicles in the U.S. market), available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59334P.PDF (last accessed August 24, 2019).

by Bosch, Audi, and Volkswagen, in connection with NHTSA's Office of Defect Investigations

("ODI") Inquiry No. INRD-EA11003. On information and belief, this documentation was

contemporaneously made publicly available on NHTSA's website and GM would have had

access to and become aware of this documentation setting forth the CP4 failures.

93.     The documentation includes, for example, a March 7, 2011 Bosch Submission to

NHTSA, in a document entitled "IND-EA11003-59347P.pdf," that states Audi sent Bosch a

failed CP4 fuel pump in 2009 for analysis after "[t]he high pressure fuel pump failed

catastrophically shedding metal shavings throughout the entire fuel system . . . This car will

require a complete new fuel system from tank to injectors and everything in between. This will

be a very lengthy repair (weeks) . . . We need to determine if component failure or bad fuel is to

blame."   Similarly, the March 7, 2011 submission contained a June 9 email from Volkswagen to

Bosch stating: "I have here a pump from [sic] a 2.0 TDI.  I have been testing a lot of these this

week and many have an amount of 'metal Debris' or other metallic particles in them." [19]

94.     A July 27, 2012 Bosch submission, in a document entitled, "INRD-EA11003-

59345P.pdf," which includes a September 15, 2011 email from Volkswagen to Bosch regarding:

---

[19] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re:  "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative frustratedly states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"), available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59347P.PDF (last accessed August 24, 2019); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9-10 (Jul 4, 2008 email from Audi to Bosch re "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail?  Because of a different fuel?") available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59334P.PDF (last accessed August 24, 2019); Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (Jun. 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that **we only have a problem in certain market the fuel currently on the market is**"), available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59345P.PDF (last accessed August 24, 2019); *id*. ("I prefer to have a more robust pump").

"080211_Status_CP4.1_Bosch," in which a Volkswagen representative sent a formal "change request in [the] form of exemplary documents on failures of high-pressure diesel pump Bosch CP4. I think the failures are well known. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost [REDACTED] caused by chip contamination").

95.     Likewise, in September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[20]  Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket:[21]

---

[20] Sept. 2, 2009, email from Audi representative to Bosch representative regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003en-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed August 24, 2019), at 146.
[21] *Id*. at 148-50.







96.    Yet, GM went on to contract with Bosch to supply the CP4 fuel pumps in 2011

and later model years. Seeking to gain an advantage, GM began a long partnership with Bosch in

2000 beginning with the CP3 pump in GM's 2001 vehicles. This longstanding partnership would

have included Bosch sharing performance information about its CP3 and CP4 fuel pumps in

other manufacturers' vehicles such that GM was aware as early as 2008 of Audi's and

Volkswagen's CP4 fuel pump failures. But from the beginning, GM was aware of a mismatch

between Bosch's European fuel injection pumps and American diesel fuel.

97.    GM provided NHTSA with its response to the NHTSA's request for peer vehicle

information from GM as part of NHTSA's investigation into complaints of high pressure fuel

pump failure resulting in engine stall in certain Volkswagen and Audi vehicles.  As part of that

investigation, in October 2011, ODI sent a letter to GM referencing its investigation of

34

Volkswagen and Audi and requested "peer vehicle" information from GM, specifically regarding (among other things) an "[a]lleged defect" involving "[a]ny one or more of the following symptoms or conditions. . .: (1) HPFP failure; (2) Metallic debris/contamination in the fuel system; (3) Repairs involving fuel system replacement; (4) General allegations of fuel pump failure (i.e., the specific fuel pump is not identified); or (5) All other allegations of fuel system failures or malfunctions resulting in engine stall."[22] GM's response – dated December 9, 2011 – was sufficient to show a problem involving CP4 high pressure fuel pump beginning in GM's 2011 models.  For example, GM stated that in the second quarter of 2011 *alone*, it knew of at least 99 field reports of CP4 high pressure fuel pump failure in the 2011 Chevrolet Silverado, of which 30 were moving stalls.[23]

98.     Importantly, the data showed a significant uptick in fuel pump failure-related claims beginning with the 2011 model year (the first year the CP4 was implemented).  GM counted sixteen (16) fuel pump-related warranty claims in the 2011 GMC Sierra HD by October 2011, which is double the eight (8) counted in the two preceding years of Sierras combined.[24] Likewise, GM reported thirty (30) catastrophic fuel pump failures in the 2011 Chevrolet Silverado HD, which is 3.75 times the eight (8) reported in the two preceding model years of Silverados combined.[25]

99.     Likewise, the data GM provided comparing warranty claims in 2011 model year Class Vehicles with their predecessors shows a dramatic increase in fuel pump-related claims. Whereas the 2011 model year Silverado had already generated 68 warranty claims for the fuel

---

[22] Oct. 7, 2011, Ltr. from Frank S. Borris, Director, Office of Defects Investigation, to Carmen Benavides, GM Director of Product Investigations, available at https://static.nhtsa.gov/odi/inv/2011/INPR-EA11003-48548.pdf (last accessed Nov. 16, 2018).
[23] Dec. 9, 2011 letter from GM available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50067P.pdf (last visited on March 11, 2019).
[24] *Id.*
[25] *Id.*

pump as of December 9, 2011, the date of GM's response to NHTSA, the 2010 model year

Silverado only had 20.  And whereas the 2011 model year Sierra had generated 35 warranty

claims, the preceding model year only had 2.[26]

100.    A major quality control measure used by GM and other automotive manufacturers

is to compare a particular model year vehicle's warranty claims and other aggregate information

(such as driver complaints and field reports) with the preceding model year vehicle's data to

evaluate whether there is a measurable uptick in the failure rate. Modern day vehicle production

failures are typically measured per thousand vehicles or sometimes even per hundred thousand

vehicles, and defect trends are frequently identified after just one or several reported failures.

Where, like here, the early warranty rates reflected between a three-fold and seventeen-fold

increase over the previous year, GM must have recognized the existence of a defect by

December 2011 at the absolute latest, which is when it compiled this information for NHTSA

(though it was likely conducting internal analysis of its own even earlier).

101.    Federal law also requires automakers like GM to be in close contact with NHTSA

regarding potential auto defects, including imposing a legal requirement (backed by criminal

penalties) compelling the confidential disclosures of defects and related data by automakers to

NHTSA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub.

L. No. 106-414, 114 Stat. 1800 (2000).

102.    Automakers have a legal obligation to identify and report emerging safety-related

defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers

monitor NHTSA databases for consumer complaints regarding their automobiles as part of their

ongoing obligation to identify potential defects in their vehicles, including safety-related defects.

---

[26] *Id*. at 8

*Id*. Thus, GM knew or should have known of the complaint about the faulty CP4 pump logged

by NHTSA's Office of Defects investigation ("ODI"), and the complaints alerted, or should have

alerted, GM to the defect. All automobile manufacturers routinely monitor and analyze NHTSA

complaints because this information is used in determining if a recall should be issued. *See*

https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm (last visited Feb. 13, 2019).

103.    The following complaints made to NHTSA demonstrate that the defect is

widespread.  The complaints also indicate GM's awareness of the problems with the CP4 pump,

including how dangerous they can be.

> January 6, 2012 - 2011 Chevrolet Silverado 2500 - THE TRUCK HAD THE CHECK
> ENGINE LIGHT COME ON WHEN WE TOOK IT TO THE DEALERSHIP THEY
> REPLACE THE FUEL PRESSURE REGULATOR. THE LIGHT SOON CAME
> BACK ON DUE TO A FAULTY FUEL PUMP WHICH SENT THE CAR INTO
> SAFE MODE, WHICH MADE THE CAR DO A NOSE DIVE FROM 55 TO 15 IN
> A MATTER OF SECONDS ON A MAJOR INTERSTATE IN ATLANTA. *JS
> NHTSA ID 10463992

> August 31, 2012 - 2011 Chevrolet Silverado 3500 – TL* THE CONTACT OWNS A
> 2011 CHEVROLET SILVERADO 3500. THE CONTACT STATED THAT WHILE
> TRAVELING 70 MPH THE VEHICLE STALLED. THE VEHICLE WAS TOWED
> TO THE DEALER WHO DIAGNOSE THAT THE DIESEL INJECTION PUMP
> NEEDED TO BE REPLACED. THE MANUFACTURER WAS MADE AWARE
> OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE AND
> CURRENT MILEAGE WAS 11,000. NHTSA ID 10474097

> June 27, 2014 – 2012 GMC Sierra 3500 - DRIVING FROM GM DEALER FOR
> TWO MILES CHANGE FUEL FILTER MESSAGE APPEARED AND ENGINE
> DIED. TOWED TO A DEALER DIAGNOSED AS A HIGH PRESSURE
> INJECTOR PUMP FAILURE WITH METAL CONTAMINATION TO FUEL
> SYSTEM. I HAVE FOUND A BULLETIN DATED 2009 FROM EQUIPMENT
> MANUFACTURERS. THIS JOINT STATEMENT HAS INFORMATION ABOUT
> THE FUEL USED IN THE USA THAT I WAS NOT AWARE OF AND MAY
> HAVE AVOIDED THIS FAILURE. THIS IS A VERY EXPENSIVE REPAIR AS I
> USE MY TRUCK FOR WORK. *TR NHTSA ID 10607796

> July 11, 2014 - 2012 Chevrolet Silverado 2500 - VEHICLE WOULD NOT START.
> WHEN THEY PUT IT ON SCOPE THEY FOUND THAT THE FUEL RAIL
> PRESSURE WAS TO LOW. THEY FOUND METAL SHAVINGS

THROUGHOUT THE FUEL SYSTEM AS IF A PART WAS COMING APART FROM THE INSIDE. THEY HAD TO REPLACE ENTIRE FUEL SYSTEM FROM PUMP TO INJECTORS PLUS ALL THE LINES AND INJECTION PUMP. THIS VEHICLE IS 2 YEARS OLD. *TR NHTSA ID 10619113

December 8, 2014 - 2012 Chevrolet Silverado 2500 - TL* THE CONTACT OWNS A 2012 CHEVROLET SILVERADO 2500. THE CONTACT STATED THAT WHILE DRIVING AT APPROXIMATELY 35 MPH, THE VEHICLE STALLED. THE VEHICLE WAS NOT ABLE TO RESTART. THE VEHICLE WAS TOWED TO A DEALER, WHO DIAGNOSED THAT THE FUEL PUMP NEEDED TO BE REPLACED. THE TECHNICIAN MENTIONED THAT THE FUEL PUMP FRACTURED AND DEBRIS WENT THROUGH THE FUEL SYSTEM CAUSING INTERNAL DAMAGES. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 47,000. NHTSA ID 10668322

June 27, 2014 - 2012 GMC SIERRA 1500  - THE FUEL INJECTION PUMP CP4 HAD A CATASTROPHIC FAILURE AS I WAS DRIVING ON A HEAVILY TRAVELED FOUR LANE HIGHWAY, US RT.20. I LOST POWER STEERING AND BRAKES. I FELT FORTUNATE THAT I WAS NOT TOWING A 16,000 LB. FIFTH WHEEL CAMPER DOWN A MOUNTAIN ROAD.I SAY THIS BECAUSE IT WAS EXTREMELY DIFFICULT TO MAINTAIN CONTROL OVER THE TRUCK STEERING IT AND BRINGING IT TO A CONTROLLED STOP. I HAVE READ ABOUT THESE PUMPS FAILING ON NUMEROUS DIESEL FORD AND GM TRUCKS. I ALSO FEEL IF A WOMAN OR SMALL PERSON HAD THIS HAPPEN TO THEM THE OUTCOME COULD END IN LOSS OF CONTROL RESULTING IN INJURIES EVEN DEATHS. THE ONLY ONE THAT KNOWS THE ACTUAL NUMBER OF PUMPS THAT HAVE FAILED IS THE MANUFACTURERS, WHO WILL NOT SHARE THAT INFORMATION WILLINGLY. *JS NHTSA ID 10681960

April 27, 2015 – 2011 GMC SIERRA 3500 - VEHICLE WAS TRAVELING DOWN ACCESS ROAD COMING UP TO INTERSTATE OFFRAMP. RIGHT BEFORE YIELD SIGN BOSCH CP4 PUMP FAILED STOPPING MOTOR. BRAKES AND STEERING AFFECTED. JUST ENOUGH MOMENTUM TO FIGHT TRUCK INTO ADJACENT PARKING LOT RIGHT AFTER RAMP. *TR NHTSA ID 10714457

May 15, 2015 – 2011 GMC SIERRA 3500 -WHILE DRIVING UP HILL THE TRUCK JUST SHUT OFF. COULD NOT START IT AGAIN. THERE WAS NO WARNING SIGNS IT TOOK OVER 2 WEEKS AND 2 DIFFERENT GM DEALERS TO FIGURE OUT IT WAS A FUEL INJECTOR PUMP THAT EXPLODED. THERE WERE NO CODES ON THE TRUCKS COMPUTER TO ACKNOWLEDGE THERE WAS ANY PROBLEM WITH THE TRUCK EVEN AFTER IT WOULD NOT START. COULD HAVE BEEN EXTREMELY

38

DANGEROUS IF OUR CIRCUMSTANCE WE'RE DIDFERENT. 5 MILES EARLIER AND WE WOULD HAVE BEEN ON AN EXPRESS WAY. NHTSA ID 10730877

August 2, 2015 – 2013 Chevrolet Silverado 2500 - ON AUG 2, 2015 ABOUT 25 MILES EAST OF GRAND JUNCTION CO. DRIVING SPEED WAS ABOUT 65 MPH ON INTERSTAE I-70. MY CHEVY SILVERADO 2500 WENT INTO A COMPUTER SHUT DOWN.BEING A SKILLED PROFESSIONAL DRIVER , WITH A CLASS A CDL I JUST MADE IT TO THE SHOULDER BEFORE TRUCK SHUR DOWN, TRUCK AND TRAVEL TRAILER I WAS TOWING NEEDED TO BE TOWED TO ED BOZARTH GM DEALER.ON MONDAY I WAS INFORMED WOULD NEED TO PAY $ 775 TO DETERMINE POINT OF FAILURE. AT THE TIME A COMPANY CALLED SPEEDCO WAS AND MAYBE SUSPECT AS TO CAUSE. THE DID A OIL CHANGE AND FUEL FILTER IN W. MEMPHIS AR. THIS SERVICE WAS DONE ON JULY 24,2015. ON JULY 25,2015 TRUCK NO START, SPEEDCO CAME OUT WITH ANOTHER FUEL FILTER. WHEN FIRST FUEL FILTER TAKEN OFF , THERE WERE NO GASKETS. HOWEVER GM APPEARS TO BE CONCELING MATERIAL FACTS AS TO INTERNAL SERVICE BULLETINS. THIS BULLETIN AS TO POINT FAILER WAS PRINTED AUG 3, 2015 , 5 PAGES . A ESTIMATE BY SAID DEALER WAS GIVEN TO SPEEDCO AND MYSELF IN THE AMOUNT OF $ 8,692.02. WHEN THE FUEL INJECTION PUMP WENT , SENT METAL SHAVINGS THOUGH MY WHOLE SYSTEM ENGINE, FUEL OIL, COOLING SYSTEM ECT. GM HAS KNOW ABOUT THIS PROBLEM FOR A LONG TIME, HOWEVER FAILED TO DISCLOSE TO ITS CUSTOMERS. IN MY OPINION TO ALLOW FOR WARRANTY TO EXPIRE. ONCE SPEEDCO WAS PRESENTED WITH SERVICE BULLETIN THEY BACKED DOWN FROM PAYING. GM HAD PROVED TO SPEEDCO THAT GM IS THE PROBLEM. I HAVE CONTACTED GM IN DETROIT MANY TIMES WITH DIFFERENT CASE NUMBERS. ONE PHONE CALL I GOT FROM GM , STATED THE ORIGINAL ESTIMATED STATED ABOVE WAS FAR LOW. WHEN I ASKED HOW MUCH, STATED TO ME COULD NOT SAY HOWEVER MUCH HIGHER. I'M IN POSSESSION OF A LOT OF DOCUMENTATION. I HAVN'T SCANED THE DOCUMENTS YET. THIS TRUCK WAS PURCHASED IN OCT. OF 2013 FOR $ 56,000, BANK FINANCING. ALSO THIS TRUCK WAS PURCHASED TO EARN A LIVING PULLING NEW TRAVEL TRAILERS. MY EXCELLENT CREDIT IS ON THE LINE DUE TO THIS LEMOM. TRUCK HAD 20K, WITH WARRANTY.

June 13, 2016 – 2012 Chevrolet Silverado 2500 – I WAS DRIVING DOWN A HIGHWAY ROAD WHEN MY VEHICLE ABRUPTLY LOST POWER, I RECEIVED A WARNING FROM MY DASHBOARD SAYING FUEL FILTER NEEDS REPLACING AND SUBSEQUENTLY LOST ENGINE POWER WHICH RESULTED IN NO POWER STEERING AND NO BRAKES. I WAS ABLE TO KEEP THE VEHICLE UNDER CONTROL AND GOT IT TO THE SIDE OF THE

ROAD BEFORE IT BECAME DEAD. AFTER GETTING THE VEHICLE TOWED
TO A GARAGE IT WAS DETERMINED THAT THE CP4 FUEL INJECTION
PUMP HAD FAILED RESULTING IN FUEL BEING STARVED FROM THE
ENGINE AND THE RESULT WAS THE ENGINE SHUTTING OFF. THE
REPAIRS ALONE FOR THIS SINGLE FAILURE ARE $8550 BECAUSE THIS
PUMP HAS FOULED ALL THE FUEL INJECTORS AND REGULATORS IN
THE FUEL SYSTEM. MOST IMPORTANTLY THOUGH, I WAS FORTUNATE
ENOUGH TO BE IN A POSITION ON HIGHWAY WHERE I HAD NO TRAFFIC
BEHIND ME, AND ON A RELATIVELY STRAIGHT ROAD WHERE I WAS
ABLE TO GET TO THE CURB BEFORE IT BECOME A BIGGER PROBLEM.
FROM WHAT I HAVE FOUND THIS IS BECOMING A COMMON PROBLEM
ON ALL OF THE DURAMAX 6.6L LML ENGINES UTILIZING THIS TYPE OF
FUEL INJECTION PUMP AND GM NEEDS TO RECALL THESE SYSTEMS
AND REPAIR THEM. I DO NOT HAVE THE REPAIR INVOICE YET BECAUSE
THE VEHICLE IS STILL BEING REPAIRED BUT WILL BE HAPPY TO
SUPPLY IT WHEN I RECEIVE IT. NHTSA ID 10873931

March 15, 2017 – 2012 Chevrolet Silverado 3500
WHILE DRIVING ON A FOUR-LANE HIGHWAY TOWING OUR 15,500 LB
FIFTH WHEEL, SUDDENLY, WITHOUT ANY WARNING, WE HEARD
RATTLING, LOST POWER, AND THE ENGINE SHUT DOWN. THE NOISE
AND LOSS OF PROPULSION, POWER STEERING AND POWER BRAKES ALL
OCCURRED WITHIN ABOUT 2-3 SECONDS. GRATEFULLY, THE DRIVER
HAD THE FORTITUDE TO IMMEDIATELY BEGIN PULLING ONTO THE
SHOULDER OF THE SLIGHT DOWNWARD SLOPE ON WHICH WERE WERE
DRIVING. LUCKILY, WE WERE ON A STRETCH OF ROAD THAT WAS NOT
INCLINED, NOT IN A CONSTRUCTION ZONE WITH BARRIERS, NOT IN A
SNOWY MOUNTAIN PASS OR IN OTHER INCLEMENT WEATHER, NOT IN
THE LEFT LANE PASSING, ETC. HAD ANY OF THESE FACTORS
PREVENTED US FROM SIMPLY PULLING ONTO THE SHOULDER OF THE
ROAD, THE POTENTIAL FOR A LIFE THREATENING ACCIDENT WOULD
HAVE BEEN SIGNIFICANT.

THE CHEVROLET/GM SERVICE CENTER CONFIRMED THE BOSCH CP4
HPFP SUFFERED A CATASTROPHIC FAILURE, DESTROYING THE ENTIRE
FUEL SYSTEM OF THE TRUCK. GM IS COVERING PART OF THE REPAIR
COSTS (TRUCK IS AT 119,705 MILES), BUT OUR BILL WILL REMAIN
SUBSTANTIAL.

RESEARCH OF DIESEL, TDI, AND OTHER FORUMS DOCUMENT THIS
PROBLEM AS WELL-KNOWN AND BROADER THAN THE EXISTING 9
COMPLAINTS IN THE NHSTA PUBLIC DATABASE AND THE
INVESTIGATION OF VW/AUDI. SOME PEOPLE ARE EVEN REPORTING
MULTIPLE FAILURES. THE MOST COMMON BELIEVABLE CAUSE OF THE

FAILURES SEEMS TO BE A MISMATCH OF LUBRICITY SPECS BETWEEN THE BOSCH CP4 AND THE DIESEL FUEL IN THE U.S.

PLEASE OPEN AN INVESTIGATION, AND ORDER GM, FORD, VW, BOSCH AND OTHERS TO RECALL THESE VEHICLES TO PROVIDE THE NECESSARY REPAIRS. ALSO PLEASE MANDATE, TO THE EXTENT YOU'RE ABLE, REIMBURSEMENT TO THOSE OF US PAYING FOR REPAIRS TODAY. I HAVE READ, BUT HAVE NOT BEEN ABLE TO CONFIRM, THAT VW EXTENDED THE WARRANTY TO 120K MILES. THIS SEEMS LIKE A MINIMUM (MORE IS BETTER) STEP, AND IT SHOULD BE RETROACTIVE. R NHTSA ID 10966092

Sept. 11, 2017 – 2014 GMC Sierra 2500 - MY FUEL PUMP AND INJECTORS FAILED WHILE I WAS DRIVING, STRANDING MY TRUCK IN THE MIDDLE OF TRAFFIC RIGHT WHERE A CITY STREET WAS CHANGING TO A COUNTRY ROAD. THE GMC DEALERSHIP FALSELY CLAIMED THAT THIS WAS CAUSED BY USING UNAPPROVED FUEL. THE FUEL I USED WAS B20 BIODIESEL, WITH 80% RENEWABLE DIESEL, WHICH MEETS DIESEL SPECIFICATIONS AND IS A LEGAL ROAD FUEL IN CALIFORNIA. THEY ALSO CLAIMED THAT A CASCADE OF OTHER PROBLEMS WERE ALL CAUSED BY MY FUEL AND REFUSED TO APPLY MY WARRANTY. NHTSA ID 11045708

104.    Complaints concerning the CP4 fuel pumps can also be found on online forums.

For example, on the "Duramax Forum.com," an owner of a 2011 Chevrolet Silverado 3500 Crew

Cab 6.6L Duramax wrote on October 5, 2010:

Ive got 3200 miles on my 2011 3500 srw, crew cab, 4x4, z71, duramax. And ive already got- in my opinion a serious[] problem- it wont start. Cranks and Cranks and cranks. Usually it finally starts. After extensive sdiagnostic review, the dealer and the chief duramax engineer from gm feel its an Injector Pump issue. . . . Of course the part is back ordered. Any one else had similar issues? Im pretty frustrated.[27]

105.    Another commenter in the same forum wrote on January 2015 re: "2015 Duramax

Injection Pump Troubles," as follows: "I have a new 2015 GMC 3500 with 14k miles that the

injection pump crapped out on me. Dealer has had it for 3 ½ weeks.  Was told if they find any

---

[27] https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/72500-2011-injectorpump-failure.html (last accessed August 19, 2019).

metal they would have to tear the engine down. Well they found metal but didn't tear it all the way down. Has anyone else had an issue [with] the injection pump on the 2015 Duramax."  A forum member responded, "lots of LML's have had injector pump issues in the states go down to the LML [forum] and read, its caused by the new cp4.2 pump that needs better fuel then what you can buy."  Another forum member added "To bad the dealers wont just install a cp3 instead of the crappy cp4 when these go out in the lml's. It only makes sense!"[28]

106.     Describing an experience diagnosed by a GM dealership as a high pressure fuel pump failure, the owner of a 2011 GMC Sierra HD 2500 quoted the GM dealership's service technician in an October 13, 2013 comment on TheDieselPageForums.com as follows:

> CONTAMINATED FUEL SYSTEM CAUSED BY HIGH PRESSURE PUMP FAILURE[.] CRANK NO START-SCAN PCM, NO FAILURE CODES. CHECK CRANK SENSOR OPERATION AND CRANKING RPM'S-HAS NORMAL CRANKING SPEED AND RPM'S. CHECK FUEL API RATING-API OF 40. INSPECT FOR FUEL LEAKS AND AIR IN FUEL SYSTEM-NO AIR AND NO FUEL LEAKS. CHECK FUEL PRESSURE WHILE CRANKING...INSTALL PRESSURE GUAGE AT FUEL TEST PORT AND AND PUMP TO 10 PSI WITH FUEL PRIMER PUMP-CRANK ENGINE FUEL PRESSURE DOES NOT DROP.  CALL TAC. INSPECT FUEL PRESSURE REGULATOR AND SENSORS FOR METAL DEBRIS. **FOUND FUEL SYSTEM CONTAMINATED WITH METAL FROM HIGH PRESSURE FUEL PUMP.** SEE PIP5133, PIP5151, PIP4949C. . . .[29]

107.     Several diesel truck owners in the online forum DieselPlace.com commented about similar problems in a thread entitled, "Have they fixed the CP4 issue yet?", with one owner of a 2015 GMC LML LTZ stating on December 21, 2015: "Mine just blew up at 68k. **Sent metal through the whole fuel system**. 10.5K to fix. Covered under warranty thank GOD.". Another  commenter with the handle "NorCal2500HD" stated on December 21, 2015:

---

[28] "2015 DuraMax Injection pump Troubles," Duramax Forum.com available at https://www.duramaxforum.com/forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html (last visited on August 24, 2019) (emphasis added).
[29] https://www.thedieselpageforums.com/tdpforum/archive/index.php/t-42676.html (last accessed August 19, 2019).

> There is nothing NORMAL about a +$10k repair bill. . . . If CP4s failed like CP3[']s nobody would be talking about it. But the fact they puke with no [failsafe] is the real issue. When people are having to take out 2nd mortgages to get their truck repaired there's a problem with that.

108.     Importantly, GM was on notice—and indeed, has repeatedly *admitted*—that the safety risks of moving stalls or "no-starts" such as those associated with the CP4 fuel pump pose an inherent risk to vehicle occupant safety. In 2014, GM issued a series of safety recalls for approximately 30 million vehicles due to an ignition switch defect which caused, among other things, loss of engine power (in other words, moving stalls), which "increase[d] the risk of a crash."[30] Because the Class Vehicles have an inherent safety defect (as evidenced by the customer complaints cited herein), the purchasers and lessors of the Class Vehicles have been economically injured, because a vehicle which later turns out to have a safety defect is clearly worth less than it was at the point-of-sale while the defect was still being concealed.

109.     GM also issued bulletins to its dealers – not consumers – that also indicates its awareness of the problem.  In August 2014, GM issued a Service Bulletin entitled "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump replacement," for vehicles with the 6.6L Duramax Diesel RPO codes LGH and LML, including, for the 2010-2015 GMC Sierra, which states that "a dealer may encounter a customer concern of a hard start or a no start," which may "lead to Fuel Injection Pump replacement," and if fuel injection pump

---

[30] *See, e.g.,* GM 573 Ltr. to NHTSA re: NHTSA Recall No. 14V346, Jun. 19, 2014. The full relevant text of paragraph 573.6(c)(5) reads as follows:
"There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the "run" position. If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash. . . ."

replacement is required than the "Fuel Pressure Regulator 1 must be inspected for magnetic metal debris.[31]"

110.    Rather than issue a recall, in March 2017, GM reissued the Preliminary Information as Technical Service Bulletin #16-NA-102 and added the 2016 model year.[32]

111.    What is more, GM stopped using the CP4 fuel pump in its vehicles, choosing instead to use the Denso HP4 fuel injection pump.[33] The Denso HP4 fuel injection pump has been available for medium and large-sized trucks since at least the 2004 model year.[34]

112.    Defendant was also aware of the defect through (1) their own records of customers' complaint, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal durability testing, and (5) other various sources.  Additionally, there are numerous independent kits provided by independent suppliers, which are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so it will be filtered before it returns to the engine.  GM would have been aware of such kits, which are only incomplete remedies.

113.    GM also is aware that the defect is not reasonably discoverable by consumers unless they experience the stalling or other symptoms firsthand and thus are exposed to the attendant safety risks. While vehicles with similar defects have been the subject of voluntary

---

[31] Service Bulletin 10044240-3551, "Duramax Diesel Hard Start No. Start P0087 P0088 P0191 P128E Or Injection Pump Replacement" available at https://static.nhtsa.gov/odi/tsbs/2014/SB-10044240-3551.pdf (last visited on March 11, 2019).

[32] #16-NA-102: Duramax Diesel Hard Start, No Start, DTCs P0087, P0088< P0191, P128E or Injection Pump Replacement available at https://f01.justanswer.com/Bluegorilla/53288260-1d95-4c61-94ef-9cbd4868f4c1_My_Boot_Camp_printed_document.pdf (last visited on March 14 2019).

[33] *See* "Everything You Need to Know About the 2017 Silverado HDS," Ultimate Diesel Builder's Guide, Nov. 1, 2017, available at https://www.pressreader.com/usa/ultimate-dieselbuilders-guide/20171101/281535111145444 (last accessed August 19, 2019).

[34] Denso Diesel Systems & Diagnostics, Technical News Bulletin, Issue 1, at 1, Dec. 2013, available at http://www.denso.ro/media/151806/2013_technical-service-bulletin_no-01.pdf (last accessed August 19, 2019) (showing different types of Denso high-pressure pumps and their range of applications, including the HP4, beginning in the 2004 2nd Generation Common Rail System).

safety recalls—which by law requires notification to owners and lessees of the danger—GM has conducted no such recall.

114.     The defective pump and its inevitable failure are not trifling concerns. Instead, they pose severe safety risks to Plaintiffs, the Class Members, and the public, and as such, GM either should not have sold or leased Plaintiffs and Class Members their vehicles or it should have fully disclosed, in a written disclosure to be acknowledged in writing by Plaintiffs and class members and through an oral disclosure to be given by GM's authorized dealerships, that the vehicles are prone to stalling and complete engine failure, including at highway speeds.

115.     Had Plaintiffs and members of the Class known of the defect at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.  Moreover, even if GM recalls the Class Vehicles and installs a different pump, Plaintiffs and members of the Class will not benefit from the performance qualities of their vehicles as advertised.

116.     GM's deliberate strategy to value profit over the truth and human health has caused – and continues to cause - serious harm to consumers nationwide.

## CAUSES OF ACTION

### COUNT I
### Violation of the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, et seq.)

117.     Plaintiffs incorporate by reference each and every allegation above as if fully restated here.

118.     Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

119.     The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "[t]he act, the use or employment by any person of any unconscionable commercial practice,

45

deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J. Stat. Ann. § 56:8-2.

120.    Plaintiffs and members of the Class are consumers who purchased and/or leased Vehicles for personal, family or household use.

121.    The Class Vehicles are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

122.    In the course of its business, GM failed to disclose and actively concealed the dangerous risk of the defect in the Class Vehicles as described above and failed to disclose and actively concealed the defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Accordingly, GM has engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent to not sell them as advertised in violation of N.J. Stat. Ann. § 56:8-2.2; and otherwise engaging in conduct likely to deceive in violation of N.J. Stat. Ann. § 56:8-2.

123.    Not only did GM know that the Class Vehicles were defective at the point of sale, but GM knew that the fuel incompatibility defect was certain to cause the CP4 fuel injection pump to fail within or shortly after the warranty period expired. GM also knew that a consumer could not reasonably discover the defect because the fuel incompatibility would only be apparent to a consumer in one of two ways: (a) if a consumer knew about the different wear scar diameter characteristics of American versus European diesel fuel and about the CP4 pump's

corresponding specifications, or (b) when the consumer experienced the effect of the defect for the first time, *e.g.*, vehicle stalling or complete failure.

124.    Moreover, information regarding the fuel incompatibility defect and regarding GM's knowledge of the defect and its certain failure was not available to the average consumer, including Plaintiffs and Class Members, in that all or most of the critical information was in the exclusive possession of GM and other industry players.

125.    GM's acts and practices, as described herein, offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because GM concealed the defective nature of the Class Vehicles from consumers.

126.    GM's actions as set forth above occurred in the conduct of trade or commerce.

127.     GM's conduct caused Plaintiffs and Class members to suffer an ascertainable loss. In addition to direct monetary losses, the Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

128.    The Plaintiffs and the other Class members were injured as a result of GM's conduct in that the Plaintiffs and the Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, they incurred costs for repairs, and their Class Vehicles suffered a diminution in value.

129.    A causal relationship exists between GM's unlawful conduct and the ascertainable losses suffered by the Plaintiffs and the Class. Had the defect in the vehicles been disclosed, consumers would not have purchased them or would have paid less for the vehicles had they decided to purchase them.

130.     Pursuant to N.J. Stat. Ann. § 56:8-20, the Plaintiffs will serve the New Jersey

Attorney General with a copy of this Complaint.

## COUNT II
### Breach of Express Warranty under N.J.S.A. § 12A-313

131.     Plaintiffs incorporate by reference each and every prior allegation above as if fully

restated here.

132.     Plaintiff Dawson brings this claim on his own behalf and on behalf of the proposed

Class.

133.     GM is a "merchant" with respect to motor vehicles within the meaning of N.J.S.A.

§12A:2-104(1).

134.     Defendant expressly warranted that the Class Vehicles were of high quality and, at a

minimum, would actually work properly.  Defendant also expressly warranted, in the warranties

described above, that it would repair, replace, or adjust all parts that malfunction or fail at no cost.

135.     Defendant breached this warranty by selling to Plaintiff Dawson and the Class

members the Class Vehicles with defects (i.e., incompatibility with U.S. diesel fuel/improper

design specifications), which are not of high quality, and which are predisposed to fail

prematurely and/or fail to function properly.

136.     As a result of Defendant's actions, Plaintiff Dawson and the Class members have

suffered economic damages including, but not limited to, costly repairs, loss of vehicle use,

substantial loss in value and resale value of the vehicles, and other related damage.

137.     Defendant's attempts to disclaim or limit these express warranties *vis-à-vis*

consumers is unconscionable and unenforceable under the circumstances here. Specifically,

Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

138.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff Dawson and members of the Class. Among other things, Plaintiff Dawson and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant.  As gross disparity in bargaining power existed between GM and the Class members, and GM knew that the Class Vehicles were defective at the time of sale and/or at the time of their first use and would fail well before their useful lives.

139.    Plaintiff Dawson and the Class members have complied with all obligations and requirements under the vehicles' express warranties, or are otherwise excused from performance of said obligations and requirements.

140.    Defendant's warranties formed a basis of the bargain when Plaintiff Dawson and members of the Class purchased or leased their Class Vehicles and Plaintiff Dawson and members of the Class relied on GM's express warranties when purchasing their Class Vehicles.

141.    Plaintiff Dawson notified GM of the breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile.  GM also knew of the defect and yet chose to conceal it and to not comply with their warranty obligations.

## COUNT III
## Breach of Implied Warranty under N.J.S.A. § 12A:2-314

142.    Plaintiffs incorporate by reference each and every prior allegation above as if fully restated here.

49

143.    Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed

Class.

144.    Defendant GM is a "merchant" with respect to motor vehicles within the meaning of

N.J.S.A. § 12A:2-104(1).

145.    A warranty that the Class Vehicles were in merchantable condition was implied by

law in the transactions when Plaintiffs purchased their Class Vehicles under N.J.S.A. § 12A:2-

104(1).

146.    These vehicles, when sold and at all times thereafter, were not merchantable and were

not fit for the ordinary purpose for which cars are used due to their incompatibility with  diesel

fuel sold in the United States, which is the fuel intended to be used by GM.  The use of such fuel

causes the failure of the CP4 fuel pump resulting in catastrophic failure of the CP4 pump and

failure of other parts in the Class Vehicles.

147.    As a direct and proximate result of GM's breach of the warranties of merchantability,

Plaintiffs and the Class have been damaged in an amount to be proven at trial.

148.    GM's attempt to disclaim or limited the implied warranty of merchantability vis-à-vis

consumers is unconscionable and unenforceable here.  Specifically, Defendant's warranty limitation

is unenforceable because Defendant knowingly sold a defective product without informing

consumers about the defect.

149.    The time limits contained in Defendants' warranty period were also unconscionable

and inadequate to protect Plaintiffs and member of the Class. Among other things, Plaintiffs and

members of the Class had no meaningful choice in determining these time limitations, the terms

of which unreasonably favored Defendants. A gross disparity in bargaining power existed

between GM and Class members, and GM knew that the Vehicles were defective at the time of sale and would fail well before their useful lives.

150.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

151.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Class.

## COUNT IV
### Violation of Magnuson - Moss Act
### (15 U.S.C. §§ 2301, *et seq*.)

152.    Plaintiffs incorporate by reference each and every prior allegation as if fully restated here.

153.    Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

154.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1331.

155.    GM's Class Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

156.    Plaintiffs and members of the Class are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

157.    GM is a "supplier" and "warrantor" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

158.    15 U.S.C. § 2310(d) (1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

159.    GM provided Plaintiffs and members of the Class with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

160.    GM's express warranties are warranties within the meaning of 15 U.S.C. § 2301(6).

161.    GM has breached these warranties as described in more detail above.  Without limitation, GM's Class Vehicles are equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel, the intended and only reasonably available fuel, as described above, which resulted in the problems and failures also described above.

162.    By GM's conduct as described herein, including GM's knowledge of the defects inherent in the vehicles and its action, and inaction, in the face of the knowledge, GM has failed to comply with its obligations under its written and implied promises, warranties, and representations.

163.    Plaintiffs and members of the Class have had sufficient direct dealings with either GM or its agents (dealerships and technical support) to establish privity of contract between GM, on one hand, and Plaintiffs and each of the other Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

164.    Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so, and GM has failed, after numerous attempts, to cure the defects.  At the time of sale or lease of each Class

52

Vehicle, GM knew or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

165.     In its capacity as a warrantor, and by the conduct described herein, any attempts by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles are unconscionable and any such effort to disclaim, or otherwise limit, liability is null and void.

166.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class members have not re-accepted their Vehicles by retaining them.

167.     All jurisdictional prerequisites have been satisfied.

168.     Plaintiffs and the members of the Class seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

**COUNT V**
**Unjust Enrichment**
**(Common Law)**

169.     Plaintiffs incorporate by reference each and every prior and allegation as if fully restated here.

170.     Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

171.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Defendant charged a higher price for their vehicles than the vehicles' true value. Plaintiffs and Members of the Class paid that higher price for their vehicles to Defendant's authorized dealers, which are in Defendant's control. Defendant also reaps huge profits from the sales of its vehicles through its authorized dealers, netting $113,792,000 in 2018 alone.

172.    Additionally, as a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, Plaintiffs and Members of the Class have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon GM.

173.    Defendant has retained the benefit of increased financial gains, and know of and appreciate this benefit.

174.    Defendant was and continues to be unjustly enriched at the expense of Plaintiffs and Class members due to the known defects in the Class Vehicles.

175.    Defendant should be required to disgorge this unjust enrichment.

## VII.   **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against GM, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' undersigned counsel as Class Counsel;

B.    An order temporarily and permanently enjoining GM from continuing the unlawful, deceptive, fraudulent and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program;

D.    Costs, restitution, damages, including treble and punitive damages, and disgorgement in an amount to be determined at trial;

     E.      An order requiring GM to pay both pre- and post-judgment interest on any

amounts awarded;

     F.      An award of costs and attorneys' fees; and

     G.      Such other or further relief as may be appropriate.

## VIII.  **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims and issues so triable.


Dated:  August 26, 2019           Respectfully submitted,

                                      BERGER MONTAGUE PC


                                 /s/ Russell D. Paul
                                Russell D. Paul (NJ Bar # 037411989)
                                Eric Lechtzin (NJ Bar # 011841992)
                                Shoshana Savett
                                Amey J. Park (NJ Bar #070422014)
                                1818 Market Street
                                Suite 3600
                                Philadelphia, PA  19103
                                Tel: (215) 875-3000
                                Fax: (215) 875-4604
                                rpaul@bm.net
                                elechtzin@bm.net
                                stsavett@bm.net


                                *Attorneys for Plaintiffs and the Proposed Classes*